**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BUZZFEED, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No:  18-01556 (TSC) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.      PROCEDURAL HISTORY ........................................................................ 2

II.     LETHAL INJECTION REGULATIONS AND LITIGATION ........................ 5

LEGAL STANDARD ............................................................................................ 7

ARGUMENT ....................................................................................................... 9

I.      BOP CONDUCTED ADEQUATE SEARCHES FOR RESPONSIVE RECORDS ......... 9

II.     APPLICATION OF EXEMPTIONS .......................................................... 13

        A.      FOIA Exemption 7 ...................................................................... 14

                1.      The Records Were Compiled for Law Enforcement Purposes ................. 14

                2.      Exemption 7(A) ................................................................. 16

                3.      Exemption 7(C) – and Exemption 6 ....................................... 24

                4.      Exemption 7(E) ................................................................. 29

                5.      Exemption 7(F) ................................................................. 31

        B.      FOIA EXEMPTION 4 .................................................................. 33

        C.      FOIA EXEMPTION 5 .................................................................. 38

                1.      Deliberative Process, Attorney-Work Product and Attorney-Client
                        Privileges.............................................................................. 38

                        1.      Deliberative Process Privilege ....................................... 38

                        2.      The Attorney Work-Product Doctrine .......................... 40

                        3.      The Attorney-Client Privilege....................................... 40

        B.      BOP's Application of Exemption 5 and the Privileges ............................ 41

CONCLUSION.................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*Access Reports v. DOJ*,
    926 F.2d 1192 (D.C. Cir. 1991) ................................................................................ 39

*Am. Civil Liberties Union v. DOJ*,
    655 F.3d 1 (D.C. Cir. 2011) ...................................................................................... 25

*Anderson v. BOP*,
    806 F. Supp. 2d 121 (D.D.C. 2011) .......................................................................... 15

*August v. FBI*,
    328 F.3d 697 (D.C. Cir. 2003) .................................................................................. 18

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
    473 F.3d 312 (D.C. Cir. 2006) .................................................................................. 34

*Barnard v. DHS*,
    598 F. Supp. 2d 1 (D.D.C. 2009) .............................................................................. 30

*Blackwell v. FBI*,
    646 F.3d 37 (D.C. Cir. 2011) ........................................................................ 14, 15, 30

*Boehm v. FBI*,
    948 F. Supp. 2d 9 (D.D.C. 2013) .............................................................................. 32

*Brayton v. Office of U.S. Trade Rep.*,
    641 F.3d 521 (D.C. Cir. 2011) .................................................................................... 8

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) ............................................................................................... 17

*Campbell v. DOJ*,
    164 F.3d 20 (D.C. Cir. 1998) .................................................................................... 14

*CIA v. Sims*,
    471 U.S. 159 (1985) ..................................................................................................... 8

*Clemente v. FBI*,
    867 F.3d 111 (D.C. Cir. 2017) .................................................................................. 15

ii

*Coastal States Gas Corp. v. Dep't of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) ............................................................ 38, 39, 40, 43

*CREW v. DOJ,*
    746 F.3d 1082 (D.C. Cir. 2014) .................................................................... 16

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n,*
    975 F.2d 871 (D.C. Cir. 1992) ...................................................................... 34

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,*
    405 F. Supp. 3d 127 (D.D.C. 2019) ........................................................ 27, 28

*Davis v. DOJ,*
    968 F.2d 1276 (D.C. Cir. 1992) .................................................................... 25

*DOJ v. Reporters Comm. for Freedom of the Press,*
    489 U.S. 749 (1989) ...................................................................................... 25

*Dudman Commc'ns Corp. v. Dep't of the Air Force,*
    815 F.2d 1565 (D.C. Cir. 1987) .................................................................... 39

*Elec. Privacy Info. Ctr. v. DHS,*
    777 F.3d 518 (D.C. Cir. 2015) ................................................................ 15, 16

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,*
    117 F. Supp. 3d 46 (D.D.C. 2015) ......................................................... 34, 36

*Enmund v. Fla.,*
    458 U.S. 782 (1982) ...................................................................................... 16

*EPIC v. DHS,*
    384 F. Supp. 2d 100 (D.D.C. 2005) ...................................................... 27, 40, 41

*EPIC v. DOJ,*
    82 F. Supp. 3d 307 (D.D.C. 2015) ................................................................ 24

*Eugene Burger Mgmt. Corp. v. U.S. Dept. of Housing and Urban Dev.,*
    192 F.R.D. 1 (D.D.C. 1999) .......................................................................... 38

*Execution Protocol Cases,*
    955 F.3d 106 (D.C. Cir. 2020) ........................................................................ 7

*FBI v. Abramson*,
  456 U.S. 615 (1982) ................................................................................................ 8

*Fed. Open Market Comm. v. Merrill*,
  443 U.S. 340 (1979) .............................................................................................. 39

*FTC v. Grolier*,
  462 U.S. 19 (1983) ................................................................................................ 40

*Gellman v. Dep't of Homeland Sec.*,
  No. 16-CV-635 (CRC), 2020 WL 1323896 (D.D.C. Mar. 20, 2020) ........................ 36, 38, 44

*\*Glossip v. Gross*,
  135 S. Ct. 2726 (2015) ................................................................................. 1, 20, 21

*Gray v. McAuliffe*,
  No. 3:16-cv-982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017)........................ 22

*Griffin v. EOUSA*,
  774 F. Supp. 2d 322 (D.D.C. 2011) ....................................................................... 15

*Heggestad v. DOJ*,
  182 F. Supp. 2d 1 (D.D.C. 2000) ........................................................................... 39

*Hill v. McDonough*,
  547 U.S. 573 (2006) .............................................................................................. 17

*\*In re Lombardi*,
  741 F.3d 888 (8th Cir. 2014)................................................................................. 23

*\*In re Missouri Dep't of Corr.*,
  839 F.3d 732 (8th Cir. 2016)................................................................................. 22

*\*In re Ohio Execution Protocol Litig.*,
  845 F.3d 231 (6th Cir. 2016)............................................................................ 22, 23

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ............................................................................................ 7, 8

*\*Jordan v. Comm'r, Miss. Dep't of Corr.*,
  947 F.3d 1322 (11th Cir. 2020)............................................................................. 21

*Judicial Watch, Inc. v. DOD*,
    715 F.3d 937 (D.C. Cir. 2013) ................................................................. 9

*Judicial Watch, Inc. v. DOJ*,
    432 F.3d 366 (D.C. Cir. 2005) ........................................................... 40, 43

*Judicial Watch, Inc. v. FDA*,
    449 F.3d 141 (D.C. Cir. 2006) ............................................................... 25

*Karantsalis v. DOJ*,
    635 F.3d 497 (11th Cir. 2011) ............................................................... 15

*Lesar v. DOJ*,
    636 F.2d 472 (D.C. Cir. 1980) ............................................................... 27

*Mapother v. DOJ*,
    3 F.3d 1533 (D.C. Cir. 1993) ................................................................. 16

*Martin v. Office of Special Counsel, Merit Sys. Protection Bd.*,
    819 F.2d 1181 (D.C. Cir. 1987) ............................................................. 38

*Maydak v. DOJ*,
    218 F.3d 760 (D.C. Cir. 2000) ......................................................... 17, 18

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2009) ............................................................. 30

*\*McGehee v. Texas Dep't of Criminal Justice*,
    No. No. H-18-1546, 2018 WL 3996956 (S.D. Tex. Aug. 21, 2018) ....................................... 22

*McKinley v. Bd. Of Governors of the Fed. Reserve Sys.*,
    647 F.3d 331 (D.C. Cir. 2011) ............................................................... 40

*Mead Data Cent. Inc. v. Dep't of the Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ........................................................... 40, 41

*Military Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ................................................................. 8

*Miller v. DOJ*,
    872 F. Supp. 2d 12 (D.D.C. 2012) ............................................................. 8

*Nadler v. FDIC*,
92 F.3d 93 (2d Cir. 1996) ................................................................................ 34

*Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*,
71 F.3d 885 (D.C. Cir. 1995) ............................................................................ 9

*Nat'l Parks & Conservation Ass'n v. Morton*,
498 F.2d 765 (D.C. Cir. 1974),
*abrogated on other grounds by Food Marketing Institute v. Argus Leader Media*, 139 S. Ct.
2356 (2019) ............................................................................ 33, 35, 37

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978) ........................................................................................ 16

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) .................................................................................. 38, 39

*Oglesby v. U.S. Dep't of Army*,
920 F.2d 57 (D.C. Cir. 1990) ....................................................................... 9, 13

*Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*,
CIV.A. 04-00377, 2006 WL 1826185 (D.D.C. June 30, 2006) .............................. 32

*Petroleum Info. Corp. v. Dep't of the Interior*,
976 F.2d 1429 (D.C. Cir. 1992) ....................................................................... 39

*Pub. Citizen Health Research Group v. NIH*,
209 F. Supp. 2d 37 (D.D.C. 2002) ................................................................... 34

*Pub. Emps. for Envtl. Resp. v. Int'l Boundary & Water Comm'n.*,
740 F.3d 195 (D.C. Cir. 2014) ............................................................. 14, 29, 30

*Raulerson v. Ashcroft*,
271 F. Supp. 2d 17 (D.D.C. 2002) ................................................................... 32

*Reed v. NLRB*,
927 F.2d 1249 (D.C. Cir. 1991) ....................................................................... 25

*Sack v. DOD*,
823 F.3d 687 (D.C. Cir. 2016) ................................................................... 15, 16

*SafeCard Servs. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ......................................................... 8, 9, 10, 28

*Sarno v. DOJ,
   278 F. Supp. 3d 112 (D.D.C. 2017) ........................................................ 18

Schlefer v. United States,
   702 F.2d 233 (D.C. Cir. 1983) ............................................................. 40

Schrecker v. DOJ,
   349 F.3d 657 (D.C. Cir. 2003) ............................................................... 9

Steinberg v. DOJ,
   23 F.3d 548 (D.C. Cir. 1994) ............................................................... 10

Sussman v. U.S. Marshals Serv.,
   494 F.3d 1106 (D.C. Cir. 2007) ........................................................... 24

*Texas Dep't of Criminal Justice v. Levin,
   572 S.W.3d 671 (Tex. 2019) ...................................................... 21, 33, 36

U.S. Dep't of State v. Wash. Post Co.,
   456 U.S. 595 (1982) ............................................................................ 25

Vaughn v. Rosen,
   523 F.2d 1136 (D.C. Cir. 1975) ........................................................... 39

Walston v. U.S. Dep't of Def.,
   238 F. Supp. 3d 57 (D.D.C. 2017) .................................................. 25, 27

Washington ["CREW"] v. DOJ,
   978 F. Supp. 2d 1 (D.D.C. 2013) ........................................................... 9

Weisberg v. DOJ,
   627 F.2d 365 (D.C. Cir. 1980) ............................................................... 8

**STATUTES**

5 U.S.C. § 551 ........................................................................................ 34

5 U.S.C. § 552 .................................................................................. passim

5 U.S.C. § 8401 ..................................................................................... 14

18 U.S.C. § 3015 .................................................................................... 14

18 U.S.C. § 4012 .................................................................................................................... 14

18 U.S.C. § 4042 .................................................................................................................... 14

28 U.S.C. § 2241 .................................................................................................................... 17

28 U.S.C. § 2255 .................................................................................................................... 18

## REGULATIONS

28 C.F.R. § 26.3 ................................................................................................................ 5, 16

28 C.F.R. § 511 ...................................................................................................................... 14

28 C.F.R. § 552 ...................................................................................................................... 14

## OTHER AUTHORITIES

Chris McDaniel,
    FBI Documents Don't Back Up Claimed Threat to Execution Drug Supplier,
    BUZZFEED.NEWS (August 29, 2016, 10:04 p.m.), https://www.buzzfeednews.com/article/
    chrismcdaniel/fbi-documents-dont-back-up-claimed-threat-to-execution-drug ...................... 32

## INTRODUCTION

In this Freedom of Information Act ("FOIA") litigation, Plaintiff Buzzfeed, Inc. ("Plaintiff") seeks information regarding lethal injection substances that Defendant, the Federal Bureau of Prisons ("BOP"), considered for inclusion in its lethal injection protocol between August 23, 2013 and August 23, 2015. After a thorough search and careful review of records responsive to Plaintiff's FOIA request, BOP (and its co-Defendant, the Department of Justice ("DOJ")) has determined that the vast majority of such records are exempt from disclosure under one or more of the following FOIA exemptions: Exemptions 4, 5, 6, 7(A), 7(C), 7(E), and 7(F). A small number of records contained segregable, non-exempt information and have been released to Plaintiff.

At bottom, Plaintiff's request primarily seeks records that would be catastrophic to BOP's ability to carry out its legal responsibility to effectuate federal death sentences. Put simply, for various reasons, including harassment by anti-death penalty advocates, negative publicity and associated financial risk, and general safety, commercial businesses who supply or offer to supply lethal injection substances to the federal government do not want their identities publicly disclosed and will cease providing such substances if disclosure occurs. *See Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015) (cataloguing such events). In the absence of lethal injection drugs, the federal government's ability to carry out capital punishment pursuant to its existing regulations will be significantly obstructed. Thus, BOP has properly withheld records containing identifying information about suppliers and potential suppliers of lethal injection substances under FOIA Exemptions 7(A) (interference with law enforcement proceedings) and 7(E) (law enforcement techniques, procedures, and guidelines), as well as various other exemptions that protect the privacy and confidentiality of third parties in this context, including Exemption 4 (confidential commercial and financial information), Exemption 6 (privacy of individuals), Exemption 7(C) (privacy of

1

individuals, law enforcement records), and Exemption 7(F) (individual safety, law enforcement records). Similar privacy concerns warrant the protection of personally-identifying information for BOP and DOJ staff who are or were engaged in the process of deliberating over, determining, and/or carrying out the federal death penalty under Exemptions 6, 7(C), and 7(F).

In addition, portions of Plaintiff's request on their face seek records covered by the deliberative process privilege and have been properly withheld under FOIA Exemption 5 because they seek communications reflecting BOP's efforts to revise its lethal injection protocol between roughly 2013 and 2015. Those efforts—also withheld under Exemption 7(E) where they would reveal BOP guidance, techniques and procedures--coincided with a period of stasis in legal challenges to BOP's prior protocol that were revived when BOP announced its revised protocol in July 2019. Plaintiff's request seeks information that was and is related to that litigation and disclosure of the requested communications risks exposing both attorney-client privileged communications and attorney work-product, which are also exempt under FOIA Exemption 5.

With these concerns in mind, and as demonstrated by the declarations and exhibits filed herewith, BOP carefully searched for and reviewed all records responsive to Plaintiff's request and applied the appropriate FOIA exemptions to them. Because there is no genuine issue of material fact in this case, Defendants BOP and DOJ are entitled to summary judgment.

## BACKGROUND

### I.   PROCEDURAL HISTORY

By electronic submission through the DOJ web portal on August 25, 2015, Christopher McDaniel, a reporter for Buzzfeed, submitted a FOIA request, which was assigned tracking number EMRUFOIA082515-2 by DOJ. Declaration of Kara Christenson ("Christenson Decl.") ¶

12 & Ex. A; *see also* Defendants' Statement of Material Facts as to Which There Is No Genuine

Dispute ("Defs. SOF") ¶ 1.  In his request, Mr. McDaniel sought "copies of any and all records in

the possession of the Department of Justice, regardless of who produced them, regarding the

following over the past 2 years ending today:

1. Emails pertaining to an effort to obtain lethal injection chemicals;
2. Emails pertaining to an attempt to select a drug for use in lethal injections;
3. Emails in which sodium thiopental, midazolam, pentobarbital were discussed;
4. All records indicating the federal government's current inventory of execution drugs;
5. All records indicating the source of all execution drugs in the federal government's current inventory;
6. All records indicating the person or persons that authorized the purchase(s) of all execution drugs in the federal government's current inventory;
7. All email messages between the Department and any supplier or potential supplier of execution drugs;
8. All email messages between the Department and the Bureau of Prisons regarding execution drugs.

Christenson Decl. ¶ 12 & Ex. B; Defs. SOF ¶ 2.

This request was referred to BOP on August 31, 2015, and BOP Central Office FOIA staff

assigned FOIA Request No. 2015-07460 to the request.  Christenson Decl. ¶ 13; Defs. SOF ¶ 3.

At the time, BOP determined that all responsive documents should be withheld in full pursuant to

FOIA exemption 7(A), and that FOIA Exemptions 5, 6, 7(C), 7(E), and 7(F) were also applicable.

Christenson Decl. ¶ 15 & Ex. C; Defs. SOF ¶ 4.  On May 10, 2017, BOP informed Mr. McDaniel

of the release determination, the nature of the exemptions applied, and was advised of his right to

appeal BOP's determination to the Office of Information and Policy ("OIP").  Christenson Decl.

¶ 16 & Ex. C; Defs. SOF ¶ 6.

On July 7, 2017, Mr. McDaniel filed an appeal with OIP regarding BOP's withholding of the documents responsive to FOIA Request No. 2015-07460.  The appeal was assigned Appeal No. DOJ-AP-2017-005146.  Christenson Decl. ¶ 17 & Ex. D; Defs. SOF ¶ 7.  On September 19, 2017, OIP issued its response upholding BOP's determination, on modified grounds.  In its response, OIP concluded that "BOP properly withheld this information in full because it is protected from disclosure under the FOIA pursuant to 5 U.S.C. § 552(b)(7)(A) and it is reasonably foreseeable that disclosure of this information would harm the interests protected by this provision."  Christenson Decl. ¶ 18 & Ex. E; Defs. SOF ¶ 8.  Because OIP determined the information was properly withheld pursuant to Exemption 7(A), it did not address BOP's application of any other FOIA exemptions.  Christenson Decl. ¶ 18 & Ex. E; Defs. SOF ¶ 8.

Plaintiff filed the instant lawsuit on June 29, 2018.  Compl., ECF No. 1; Defs. SOF ¶ 9.  BOP filed its Answer on September 17, 2018.  Answer, ECF No. 12; Defs. SOF ¶ 10.  BOP filed a motion to dismiss for lack of jurisdiction on May 17, 2019, on the grounds that Buzzfeed did not have standing to file the Complaint given that Mr. McDaniel was the individual who filed the FOIA request.  Def.'s Mot. to Dismiss, ECF No. 26; Defs. SOF ¶ 11.  Buzzfeed opposed BOP's motion on June 28, 2019, arguing, *inter alia*, that Buzzfeed had standing because Mr. McDaniel was acting in his capacity as a Buzzfeed reporter.  Pl.'s Opp'n, ECF No. 27; Defs. SOF ¶ 12.  BOP replied on July 30, 2019.  Def.'s Reply, ECF No. 29; Defs. SOF ¶ 13.  On March 11, 2020, the Court denied BOP's motion.  *See* Minute Order (Mar. 11, 2020); Defs. SOF ¶ 14.  The Court then issued an order setting a briefing schedule, Minute Order (Apr. 22, 2020), which has since been modified with the consent of the Parties and the Court.  Minute Order (May 23, 2020).

## II.    LETHAL INJECTION REGULATIONS AND LITIGATION

BOP is tasked with setting the date, time, place and method of execution when a sentence of death has been imposed.  Specifically, "a sentence of death shall be executed: . . .  [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal."  *See* 28 C.F.R. § 26.3(a) (1993); Christenson Decl. ¶ 78.

BOP has fulfilled its law-enforcement mandate associated with the implementation of the death penalty pursuant to 28 C.F.R. § 26.3(a) three times since 1993:  Timothy McVeigh and Juan Garza in June 2001, and Louis Jones in March 2003.  Christenson Decl. ¶ 79.

Beginning in 2005, several federal condemned inmates filed civil actions in this Court alleging constitutional and statutory violations related to BOP's use of a three-drug lethal injection protocol consisting of sodium thiopental, pancuronium bromide and potassium chloride.  *See Roane, et al. v. Gonzales*, No. 05-2337 (D.D.C.); *Robinson v. Mukasey*, No. 07-2145 (D.D.C.); *Bourgeois v. DOJ, et al.*, No. 12-00782 (D.D.C.), and *Fulks v. DOJ*, No. 13-00938 (D.D.C.). Christenson Decl. ¶ 80.  On March 4, 2011, DOJ announced that "at the present time, the federal government does not have any reserves of sodium thiopental for lethal injections."  *See Roane*, 05-02337, Doc. 281 (Joint Status Report); Christenson Decl. ¶ 81.  Due to the unavailability of sodium thiopental, each of the cases was stayed pending BOP's completion of its re-evaluation and revision of the lethal injection protocol.  *See Roane,* Minute Order (July 29, 2011) & Minute Order (November 3, 2011); *Robinson*, Doc. 9 (Joint Status Report) & Minute Order (January 13, 2012);

*Bourgeois*, Doc. 14 (Joint Motion for Stay) & Doc. 15 (January 23, 2013 Order); and *Fulks*, Doc.

6 (Joint Motion for Stay) & Doc. 7 (September 13, 2013 Order).[1]  Christenson Decl. ¶ 82.

Following the stays of execution in *Roane*, *Robinson*, *Bourgeios*, and *Fulks*, and in

accordance with the regulations requiring BOP to select lethal injection substances to implement

the death penalty, BOP and DOJ engaged in a comprehensive review and revision of the federal

execution protocol.  On July 25, 2019, BOP adopted and DOJ announced an addendum to the

federal execution protocol and scheduled executions for five condemned inmates: Daniel Lewis,

Lezmond Mitchell, Wesley Purkey, Alfred Bourgeois, and Dustin Honken.  *See Roane*, 05-02338,

at Doc. 385; *see also* Christenson Decl. ¶ 83 & Ex. K.

On August 20, 2019, this Court consolidated each of the four pending protocol cases into

a newly established Master Consolidated Case:  *In the Matter of the Federal Bureau of Prisons'*

*Execution Protocol Cases*, No. 19-mc-00145 (TSC) (D.D.C.) (hereinafter "*Execution Protocol*

*Cases*").  *See Roane*, Doc. 392.[2]  Thereafter, four of the five inmates who had been scheduled for

execution (Alfred Bourgeois, Daniel Lee, Dustin Honken, and Wesley Purkey) filed motions

---

[1] While the Court in *Roane* granted a preliminary injunction barring Defendants from setting an execution date and executing plaintiffs in that matter (*see Roane*, Docs. 5, 27, 67, 68, 336 (Orders Granting Motions for Injunction)), in *Robinson*, *Bourgeois* and *Fulks*, the Defendants simply represented that no execution warrant would be sought and no execution would be carried out against the plaintiffs until revision of the lethal injection protocol was complete. *See Robinson*, Doc. 9; *Bourgeois,* Doc. 14; and *Fulks*, Doc. 6.  Christenson Decl. ¶ 82 n.12.

[2] Since the Master Consolidated Case was established, several federal death row inmates, including Lee, Purkey, and Honken, have intervened as plaintiffs in the case, or have filed separate civil cases challenging the lethal injection addendum, which have been consolidated into the Master Consolidated Case.  *See* Christenson Decl. ¶ 84 n.13.

6

seeking an injunction barring their execution. *See Execution Protocol Cases*, 19-mc-145, at Docs. 2, 13, 29, 34.  Christenson Decl. ¶ 84.

On November 20, 2019, this Court issued a preliminary injunction barring all federal executions. *Execution Protocol Cases*, 19-mc-145, at Doc. 51. On November 21, 2019, the government filed an appeal in the United States Court of Appeals for the District of Columbia, 19-5322, Doc. 1.  On April 7, 2020, the Court of Appeals for the District of Columbia vacated the district court's preliminary injunction. *Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020). Plaintiffs sought *en banc* review of the panel's decision. *Execution Protocol Cases*, No. 19-5322, Doc. 1839754 (D.C. Cir. Apr. 24, 2020).  That request was denied on May 15, 2020.  *See id*. at Order (May 15, 2020).  Plaintiffs filed for a writ of certiorari with the Supreme Court on June 5, 2020.  Christenson Decl. ¶ 85.  On June 10, Plaintiffs filed an Emergency Application for a Stay of the Mandate Pending Disposition of their petition with the Supreme Court.  *Id*.  The D.C. Circuit is scheduled to issue its mandate today, June 12, 2020.  *See Execution Protocol Cases*, No. 19-5322, Order (D.C. Cir. June 8, 2020).

Proceedings in the district court level remain pending at this time.  Plaintiffs in that case filed an Amended Complaint on June 1, 2020.  *Execution Protocol Cases*, 19-mc-145-TSC, Doc. 92.  Defendants in that case are permitted to file a dispositive motion on July 31, 2020, and subsequent pleadings may be filed as late as December 4, 2020.  *See id.* Minute Order (Mar. 18, 2020). Christenson Decl. ¶ 86.

## LEGAL STANDARD

The FOIA represents a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493

U.S. 146, 152 (1989) (quotation omitted).  "Congress recognized, however, that public disclosure is not always in the public interest."  *CIA v. Sims*, 471 U.S. 159, 166-67 (1985).  Accordingly, in enacting the FOIA, Congress "provided nine specific exemptions under which disclosure could be refused."  *FBI v. Abramson*, 456 U.S. 615, 621 (1982).  While these "exemptions are to be narrowly construed," *id*. at 630, courts must still give them "meaningful reach and application," *John Doe Agency*, 493 U.S. at 152.

A motion for summary judgment is the procedural vehicle by which FOIA cases are typically decided.  *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011) ("[T]he vast majority of FOIA cases can be resolved on summary judgment.").  "An agency may be entitled to summary judgment in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records, and each responsive record that it has located has either been produced to the plaintiff or is exempt from disclosure."  *Miller v. DOJ*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012) (citing *Weisberg v. DOJ*, 627 F.2d 365 (D.C. Cir. 1980)).  Courts review agency responses to FOIA requests de novo.  5 U.S.C. § 552(a)(4)(B).

A court may award summary judgment in a FOIA action on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).  Agency declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200

(D.C. Cir. 1991) (internal citation and quotation omitted).  "[An agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Judicial Watch, Inc. v. DOD*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (citation omitted).

## ARGUMENT

## I.   BOP CONDUCTED ADEQUATE SEARCHES FOR RESPONSIVE RECORDS

The adequacy of any FOIA search is "dependent upon the circumstances of the case." *Schrecker v. DOJ,* 349 F.3d 657, 663 (D.C. Cir. 2003); *Citizens for Responsibility & Ethics in Washington [ "CREW" ] v. DOJ*, 978 F. Supp. 2d 1, 7 (D.D.C. 2013) (noting that "[i]n some cases . . . agencies are not required to make such a detailed showing: they may categorically deny FOIA requests 'when the range of circumstances included in the category characteristically support[s] an inference that the statutory requirements for exemption are satisfied." (citing *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.,* 71 F.3d 885, 893 (D.C. Cir. 1995) (internal quotes omitted).

When conducting a search in response to a FOIA request, an agency must conduct a "reasonable search." *Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990).  An agency is not required to search every records system, but need only search those systems in which it believes responsive records are likely located.  *Id.*  A FOIA search is sufficient if the agency makes "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Nation Magazine,* 71 F.3d at 890 (internal quotation marks omitted).  The adequacy of the search is determined by whether it was "reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant."  *SafeCard Servs.,* 926 F.2d at 1201.

To demonstrate the reasonableness of its search, the agency may submit non-conclusory affidavits that explain in reasonable detail the scope and method of the agency's search. *Steinberg v. DOJ,* 23 F.3d 548, 551 (D.C. Cir. 1994). To be sufficiently detailed, an agency's affidavits must at a minimum describe "what records were searched, by whom, and through what process." *Id*. at 552. These affidavits are afforded a "presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs.,* 926 F.2d at 1200 (internal quotation marks omitted).

Applying these principles, Defendants are entitled to summary judgment with respect to the adequacy of their searches. BOP has conducted searches for records responsive to the various parts of Plaintiff's FOIA requests as follows.

Mr. McDaniel's FOIA request sought eight total categories of records, five of which, specifically Subparts 1-3 and 7-8, requested emails. *See* Christenson Decl. ¶ 21 & Ex. B; *see also* Defs. SOF ¶ 16. BOP uses a Novell GroupWise email system to provide internal and external email communication by staff. To archive email, BOP also uses the Netmail Email Archive System ("Netmail"). Netmail collects email content directly from Novell GroupWise and saves it into its separate system in an SML file format, preserving applicable metadata in the corresponding property page. Regular email messages are flagged for a seven-year retention period and emails flagged as trash are subject to a 45-day retention period. Christenson Decl. ¶ 22; Defs. SOF ¶ 17. BOP staff email is ordinarily searchable using names, date ranges, and specific search terms. After the email is searched and responsive email is located and collected, that email can be exported from Netmail for review purposes and will automatically include the corresponding property page(s). Christenson Decl. ¶ 23; Defs. SOF ¶ 18.

10

In conducting its search for email records responsive to Mr. McDaniel's FOIA request, BOP identified key words generated from Mr. McDaniel's FOIA request and then identified current and former staff who have been involved in obtaining, selecting, or purchasing lethal injection substances during the relevant time frame, including staff who oversee the United States Penitentiary located in Terre Haute, Indiana ("USP Terre Haute"), where executions for BOP inmates are performed.  Christenson Decl. ¶ 25; Defs. SOF ¶ 19.

BOP then conducted an email search of eight custodians (current and retired) using the following parameters:

    a.    <u>Date Range</u>:  August 25, 2013 through August 25, 2015.[3]

    b.    <u>Search Terms</u>:  separate searches for each identified individual for each term using the following broad terms:

        (1)    "Lethal Injection"
        (2)    "Execute"
        (3)    "Execution"
        (4)    "Thiopental"
        (5)    "Midazolam"
        (6)    "Pentobarbital"

Christenson Decl. ¶ 26; Defs. SOF ¶ 20.  BOP then reviewed all potentially responsive email records and determined that 154 records were responsive to Mr. McDaniel's FOIA request. Christenson Decl. ¶ 36; Defs. SOF ¶ 21.  Among those 154 records, 75 records were deemed duplicative.  *Id.*  BOP assigned each email record identified as responsive or duplicative a record number.  Each record number, along with a description of the record and information withheld, as

---

[3] Mr. McDaniel's FOIA request, submitted to DOJ on August 25, 2015, requested records from "the past 2 years ending today." As such, his request was interpreted as a request for records from August 25, 2013, through August 25, 2015.  Christenson Decl. ¶ 12 n.3 & Ex. B.

well as the FOIA Exemptions applied, has been enumerated in the *Vaughn* Index attached to Ms. Christenson's Declaration.  Christenson Decl. ¶ 37 & Ex. F; Defs. SOF ¶ 22.

Mr. McDaniel's FOIA request, specifically subparts 4-6, also sought non-email records. Christenson Decl. ¶ 40 & Ex. B; Defs. SOF ¶ 23.  During the relevant time frame, lethal injection substances, if any, would have been purchased by USP Terre Haute, and stored in locked space at that facility, to which only specific staff would have had access.  Documents reflecting the inventory or purchase of such substances during the relevant time frame would have been maintained in a locked filing cabinet located at USP Terre Haute, to which only specified staff had access.  Additionally, pursuant to BOP policy, any purchasing documents generated during the relevant time frame would have been forwarded for budgeting purposes to the Financial Management Department (FMD) at NCRO, and would have been maintained in a locked filing cabinet to which only specified staff had access.  Christenson Decl. ¶¶ 41-42; Defs. SOF ¶ 24. BOP staff at USP Terre Haute and NCRO FMD were told to conduct a search for any records responsive to subparts 4-6 of his request.  Christenson Decl. ¶ 43; Defs. SOF ¶ 25.

An authorized USP Terre Haute staff member conducted a search of records within the relevant time frame maintained in the locked filing cabinet where the inventory and purchasing documents would have been located.  Seven pages of documents were located and processed. Christenson Decl. ¶ 44; Defs. SOF ¶ 26.  In addition, an authorized FMD member conducted a search of records maintained in the relevant NCRO locked filing cabinet within the same relevant time frame.  Eight pages of documents were located and processed.  Christenson Decl. ¶ 45; Defs. SOF ¶ 27.  BOP reviewed the fifteen pages of records and determined that eleven pages were responsive, non-duplicative records.  These records were divided into five categories: (1) inventory

12

log; (2) inventory form; (3) invoices; (4) credit card purchase forms; and (5) packaging slips. Christenson Decl. ¶¶ 46-47; Defs. SOF ¶ 28.  Each category of records was assigned a record number.  Each record number, along with a brief description of the record and information withheld, as well as the Exemptions applied, is enumerated in the *Vaughn* Index.  Christenson Decl. ¶ 48 & Ex. F; Defs. SOF ¶ 29.

By taking the steps described above, BOP (and through BOP, DOJ) employed a reasonable and adequate search of every location where responsive records could reasonably be expected to be maintained.  BOP had no reason to believe that responsive records were likely to be maintained elsewhere.  Christenson Decl. ¶ 49.  Defendants are therefore entitled to summary judgment on the adequacy of BOP's searches.  *See Oglesby*, 920 F.2d at 68.

## II.   APPLICATION OF EXEMPTIONS

In its Complaint, Plaintiff alleges the "BOP denied [FOIA Request No. 2015-07460] in full, claiming that every single responsive record was exempt under a variety of exemptions" and asserts that "[r]elease of records about the government's efforts to obtain lethal injection chemicals will not interfere with any law enforcement proceedings . . . ."  Compl. ¶13, ECF No. 1.  Plaintiff is seeking the Court to "[o]rder Defendants to conduct a reasonable search for records and to produce all non-exempt requested records," as well as award attorney fees and costs and any other relief the Court deems appropriate.  *Id*. at Prayer for Relief.  Because BOP conducted such a search, produced all non-exempt requested records, and properly withheld all responsive documents pursuant to FOIA Exemptions 7(A), 7(C), 7(E), and 7(F), as well as Exemptions 4, 5, and 6, *see* 5 U.S.C. § 552(b)(4)-(b)(7), Defendants are entitled to summary judgment.  These Exemptions were properly applied as set forth below.

13

A.      **FOIA Exemption 7**

FOIA Exemption 7 permits agencies to withhold "records or information compiled for law enforcement purposes" when one of six conditions is present.  *See* 5 U.S.C. § 552(b)(7)(A)-(F).  To establish that information or records were compiled for law enforcement purposes, an agency need only "establish a rational nexus between an investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law."  *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (citing *Campbell v. DOJ*, 164 F.3d 20, 32 (D.C. Cir. 1998)).  BOP is a law enforcement agency and its employees perform law enforcement functions.  Christenson Decl. ¶ 111; *see* 5 U.S.C. § 8401(17)(D)(1); 18 U.S.C. §§ 3015, 4012, 4042; 28 C.F.R. §§ 511, 552.  Here, Exemptions 7(A), 7(C), 7(E), and 7(F) preclude disclosure of one or more of the records responsive to Plaintiff's FOIA request.

1.      **The Records Were Compiled for Law Enforcement Purposes**

As a threshold matter, "[t]o fall within any of the exemptions under the umbrella of Exemption (b)(7), a record must have been 'compiled for law enforcement purposes.'"  *Pub. Emps. for Envtl. Resp. v. Int'l Boundary & Water Comm'n.*, 740 F.3d 195, 202-03 (D.C. Cir. 2014) (hereinafter "*PEER*").  The records Plaintiff has requested all qualify because they focus on a core law enforcement function – the implementation of a federal criminal sentence.  "To determine whether records are compiled for law enforcement purposes, [the D.C. Circuit] has long emphasized that the focus is on how and under what circumstances the requested files were compiled and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding."  *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (citation omitted).  This is not a burdensome exercise.  Documents are "compiled for law enforcement purposes" if

14

they were, for example, "created to prevent crime and keep people safe," *Elec. Privacy Info. Ctr. v. DHS*, 777 F.3d 518, 522-23 (D.C. Cir. 2015), "deter illegal activity and ensure national security," *Sack v. DOD*, 823 F.3d 687, 694 (D.C. Cir. 2016), or otherwise show a "rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law," *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal quotation marks omitted)).

Although no precedent establishes that Exemption 7 is applicable to BOP's efforts to procure lethal injection drugs, courts have found the "compiled for law enforcement purposes" threshold satisfied for non-investigatory records that involve a law enforcement purpose. *See, e.g.*, *Karantsalis v. DOJ*, 635 F.3d 497, 502 (11th Cir. 2011) (explaining that "it is clear the booking photographs were compiled for law enforcement purposes" because the Marshals Service is "tasked" with receipt, processing, and transportation of prisoners, and photographs "were taken pursuant to this duty"); *Anderson v. BOP*, 806 F. Supp. 2d 121, 126-27 (D.D.C. 2011) (finding that statutory duty to manage federal correctional institutions satisfies threshold where, after incident at prison, "BOP determines that it is necessary to transfer an inmate to prevent future violence"); *Griffin v. EOUSA*, 774 F. Supp. 2d 322, 325 (D.D.C. 2011) (finding "Individual Custody/Detention Report" satisfies threshold because it was compiled to assist Marshals Service in carrying out its responsibilities).

Here, there can be no doubt that records responsive to Plaintiff's FOIA request for information about BOP's efforts to revise its execution protocol and identify lethal injection substances to use in that protocol have been compiled for law enforcement purposes under Exemption 7's lenient threshold. The Supreme Court has "observed that [t]he death penalty is said

15

to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Enmund v. Fla.*, 458 U.S. 782, 798 (1982) (internal quotations omitted). Deterrence is a prime law enforcement purpose, *see Sack*, 823 F.3d at 694, and *Elec. Privacy Info. Ctr.*, 777 F.3d at 523, and BOP is tasked with helping to implement that purpose by, *inter alia*, determining which substance or substances shall be used to execute a sentence of death by lethal injection. *See* 28 C.F.R. § 26.3 (a) (1993); Christenson Decl. ¶¶ 78, 112. The records Plaintiff seek all have an unmistakable connection to this task. Therefore, Exemption 7's threshold is met.

### 2.    Exemption 7(A)

Exemption (7)(A) protects records or information "compiled for law enforcement purposes" when disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). As the D.C. Circuit has explained, "Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *CREW v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). "To justify withholding, [an agency] must therefore demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *Id.* (quoting *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)). The latter two prongs of this analysis typically may be satisfied by pointing to a pending investigation or proceeding. *See id.* at 1098.

The three prongs of Exemption 7(A) are met here for all records that identify prior, current, or potential sources of lethal substances. While Defendants have found no cases that apply the

16

phrase "law enforcement proceedings" under Exemption 7(A) to the death penalty context, that is not surprising given the *sui generis* nature of such proceedings.[4]   Nor have Defendants found a case in which disclosure under FOIA might interfere with the final stage of a law enforcement proceeding: the implementation of the sentence. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) ("'Both the State and the victims of crime have an important interest in the timely enforcement of a sentence.'" (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)).

But the death penalty context is a unique and rare beast.  It engenders all sorts of litigation that can delay the imposition of the lawfully issued sentence for decades.  *See Bucklew*, 139 S. Ct. at 1133-34 (noting that the condemned inmate had continued to file numerous challenges after exhausting his state and federal habeas claims, had received two eleventh-hour stays, and had filed his constitutional challenge to the method of execution just days before his scheduled execution). *Id*.  These lawsuits include habeas challenges seeking to enjoin the government from carrying out the execution, *see Hill*, 547 U.S. at 580-83 (deeming such suits habeas challenges under 28 U.S.C. § 2241), method-of-execution challenges, *id*., as well as other creative claims whose intent and effect would be to bar or delay the timely enforcement of a capital sentence.

Few cases have touched upon whether collateral challenges to an inmate's conviction and sentence should be considered part of the criminal "law enforcement proceeding."  The D.C. Circuit came close to addressing the issue in *Maydak v. DOJ,* 218 F.3d 760 (D.C. Cir. 2000) and *August v. FBI*, 328 F.3d 697 (D.C. Cir. 2003), but in both cases the government withdrew its Exemption 7(A) argument after the prisoner's conviction was affirmed on direct appeal and the

---

[4] Only three federal inmates have been executed since 1964.  *See* Christenson Decl. ¶ 79.

17

D.C. Circuit assumed that law enforcement proceedings ended at that point. *See August*, 328 F.3d at 698 (noting in the procedural background that the government dropped its 7(A) argument after the prisoner's conviction had been affirmed); *Maydak*, 218 F.3d at 762 (same).

But more recently, this Court, in a decision by Judge Collyer, addressed the application of Exemption 7(A) to case-file information sought by a prisoner who was in the midst of pressing a post-conviction habeas challenge to his conviction under 28 U.S.C. § 2255. *See Sarno v. DOJ*, 278 F. Supp. 3d 112, 125-126 (D.D.C. 2017). Judge Collyer considered it a complex area, recognizing that "a § 2255 habeas proceeding constitutes a collateral attack by a prisoner on a fully concluded criminal proceeding." *Id*. at 126. However, she ultimately concluded that the prisoner's habeas challenge qualified as a "law enforcement proceeding" under Exemption 7(A) even though the criminal proceeding had concluded because the challenge was "an ongoing proceeding in which prosecutors must defend their prosecution and his conviction." *Id*. Judge Collyer further held that the release of the prisoner's case file could interfere with a later prosecution if the habeas challenge was successful and therefore Exemption 7(A) permitted the government to withhold the case file. *Id*.

Given that habeas challenges outside the death penalty context are considered "law enforcement proceedings" under Exemption 7(A), it stands to reason that habeas challenges and similar litigation in the death penalty context should also constitute "law enforcement proceedings" under Exemption 7(A). And where disclosure of information under FOIA would have the effect of interfering with such proceedings, for example by mooting it out or creating delay through stays, Exemption 7(A) should apply.

18

There is no question that such enforcement proceedings are pending or reasonably anticipated.  Of the 61 federal inmates on death row, over half have yet to exhaust their habeas challenges.  Christenson Decl.  ¶ 117.  And even those that have continue to litigate issues related to their death sentence.  To take one example, federal death row inmate Wesley Purkey was sentenced to death by the United States District Court for the Western District of Missouri on January 23, 2004.  *See United States v. Purkey*, Case No. 4:01-cr-308 (W.D. Mo.), Docs. 505, 506.  After exhausting his direct appeal and petitions for post-conviction relief, Purkey filed a Petition for *Writ of Certiorari* in the Supreme Court, which was denied on October 14, 2014.  *See Purkey v. United States*, Case No. 13-9783 (2014).  Since that time, Purkey has filed, and continues to file, various challenges to numerous aspects of his federal death sentence.  For example, Purkey has twice filed a petition for writ of mandamus in the Eighth Circuit Court of Appeals requesting that his execution date be set in an expeditious manner, both of which he later requested to be voluntarily dismissed.  *See In Re: Wesley Ira Purkey*, Case. No. 17-1373 (8th Cir. 2017); *In Re: Wesley Purkey*, Case No. 19-1232 (8th Cir. 2019).  Purkey has also filed two petitions in the U.S. District Court for the Southern District of Indiana concerning his sentence and execution of such sentence.  *See Purkey v. Wetson*, Case No. 2:19-00230 (S.D. Ind.) (seeking an order to expedite execution of his death sentence); *Purkey v. U.S.A. et al.,* Case No. 2:19-cv-00414 (S.D. Ind.) (seeking to vacate his conviction and sentence based on ineffective assistance of counsel and constitutional claims).  Purkey sought voluntary dismissal of Case No. 19-00230, but is pursuing an appeal of Case No. 19-cv-00414 in the Seventh Circuit Court of Appeals.  *See Purkey v. U.S.A. et al.*, Case No. 19-3318 (7th Cir.).  Purkey also currently has three (3) civil complaints pending in various jurisdictions which challenge various aspects of his sentence and execution.  *See Purkey*

19

*v. Barr, et al.,* Case No. 19-00517 (S.D. Ind.) (challenging the government's decision to select him for execution in December 2019); *Purkey v. Barr, et al.*, Case No. 19-3570 (D.D.C.) (seeking an injunction against his execution based on his alleged incompetence); and *Execution Protocol Cases*, Case No. 19-mc-00145, (challenging the government's method of execution, as described above). *See generally* Christenson Decl. ¶ 116.

And there is no question that disclosure of the identity of suppliers or potential suppliers of lethal injection drugs is reasonably likely to interfere with such proceedings. As has been well-catalogued in the media,[5] court decisions and in litigation before this very Court, the disclosure of the identity of lethal injection suppliers tends to have the effect of obstructing the government's access to lethal injection substances. Perhaps the most oft-cited discussion of this evidence is Justice Alito's recounting of the effects of anti-death penalty advocates pressure on pharmaceutical companies in *Glossip v. Gross*, 135 S. Ct. 2726 (2015). Justice Alito noted that as a result of anti-death-penalty advocates' pressure on pharmaceutical companies, the "sole American manufacturer of sodium thiopental . . . was persuaded to cease production of the drug," in the United States and then later in Italy after the manufacturer moved its operations there. In fact, "in January 2011, the company announced that it would exit the sodium thiopental market entirely." *Id*. at 2733 (internal citations omitted). Further, when the states switched to pentobarbital, "[a]nti-death-penalty advocates lobbied the Danish manufacturer of the drug to stop selling it for use in executions. That

---

[5] For an extended discussion of and citations to media reports on this issue, *see* Declaration of Rick Winter ("Winter Decl.") ¶ 17 & nn. 2-4 (referencing Exhibits B-E); Christenson Decl. ¶¶ 117-118 & nn. 18-22 (referencing Ex. O-S).

manufacturer opposed the death penalty and took steps to block the shipment of pentobarbital for use in executions in the United States." *Id*. at 2733-34 (internal citation omitted).

As this Court is well aware, the departure of the sole U.S. manufacturer of sodium thiopental in approximately 2011 effectively ended the federal government's ability to carry out its lethal injection protocol because the drug was used in BOP's then-existing three-drug methodology. *See* Christenson Decl. ¶¶ 82-83 (discussing the stays in the proceedings in *Roane*, *Robinson*, *Bourgeois* and *Fulks*, pending BOP's completion of its re-evaluation and revision of the lethal injection protocol). *See also* Winter Decl. ¶¶ 8, 16.

Cases at the state and federal level following *Glossip* have cited its discussion of the effects of anti-death-penalty advocates' pressure on pharmaceutical companies in blocking the disclosure of the identities of suppliers of lethal injection drugs so as not to jeopardize the lawful implementation of capital sentences. In reverse chronological order, examples include:

- *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1331–32 (11th Cir. 2020): the Eleventh Circuit quashed a subpoena directed to the Georgia Department of Corrections (GDC) by Mississippi death row inmates seeking specific details about the GDC's source and manner of acquiring pentobarbital. The Eleventh Circuit noted that "death penalty opponents have vigorously lobbied drug manufacturers to make [pentobarbital entirely unavailable for use in American executions," *id*. at 1326, and that "the ultimate outcome of this very effective advocacy by death penalty opponents has been to make it difficult—if not impossible—for states to acquire sodium thiopental and pentobarbital for use in executions." *Id*. at 1331-32.

- *Texas Dep't of Criminal Justice v. Levin*, 572 S.W.3d 671, 682 (Tex. 2019): Texas's Supreme Court denied a request for information regarding the source of lethal injection drugs used by Texas under the Texas Public Information Act because "disclosing the source's identity would create a substantial threat of physical harm to the source's employees and others, and therefore need not be disclosed." *Id*. at 672. *See id*. at 682 (also recognizing that a fear of negative publicity and declining sales was one of the reasons pharmacies do not want to be publicly identified as supplied lethal injection drugs).

21

- *McGehee v. Texas Dep't of Criminal Justice*, No. No. H-18-1546, 2018 WL 3996956, at *8-10 (S.D. Tex. Aug. 21, 2018):  district court quashed a subpoena directed to the Texas Department of Corrections (TDC) by Arkansas death row inmates seeking, *inter alia*, the identity of Texas' lethal injection drug supplier. The court noted that it was following a long line of cases in the Fifth Circuit in which courts have denied requests for disclosure of the identity of lethal injection sources.  *See id*. at * 8-9 (citing cases).  The court noted that Texas's fear of disclosure was not "speculative or insignificant" because it had "already lost a supplier of compounded pentobarbital after . . . disclosure in 2013."[6]  *Id*. at *9. Further, the court held that Texas had "persuasively argue[d] that disclosure would also likely impede additional sources from agreeing to supply Texas with pentobarbital," citing a declaration from Texas's anonymous supplier which "show[ed] the chilling effect that possible disclosure has on all potential sources of execution chemicals."  *Id*. at *10.

- *Gray v. McAuliffe*, No. 3:16-cv-982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017):  the district court recognized that due to "the pressure waged by death penalty opponents, it has become increasingly difficult to obtain the drugs Virginia traditionally used to render a prison unconscious during the initial stage of the execution process," *id*. at *7, and that as a result, Virginia's Department of Corrections (VDOC) was "required to enter into a Memorandum of Understanding with a compounding pharmacy before the pharmacy agreed to provide the VDOC with the necessary drugs.  Total confidentiality about the pharmacy's identity was an essential term of that agreement."  *Id*. (citation omitted).

- *In re Missouri Dep't of Corr.*, 839 F.3d 732 (8th Cir. 2016):  the Eighth Circuit, granted writs of mandamus to Missouri's Department of Correction (MDOC) and prohibiting discovery by Mississippi death row inmates seeking the identity of MDOC's anonymous supplier of pentobarbital.  The court based its decision in part on the pharmacy's declaration that it would not continue to supply Missouri with a lethal injection drug after disclosure.  839 F.3 at 736.

- *In re Ohio Execution Protocol Litig.*, 845 F.3d 231 (6th Cir. 2016): the Sixth Circuit upheld a protective order against the disclosure of Ohio's supplier of lethal injection drugs after finding that the district court "correctly found . . . . [evidence of] burdens on the willingness [of suppliers] to provide lethal injection-drugs to Ohio."  *Id*. at 238.  In particular, the court noted the evidence of an email sent to an Oklahoma compounding pharmacy that "evince[d] an undeniable . . . risk to pharmacies or

---

[6] For an extended discussion of this incident, *see* Christenson Decl. ¶¶ 62-65 & nn. 6-9.

compounders, including the personnel that work at such entities."  *Id*. at 237 (internal citation omitted).

In light of this history, the disclosure of the identity of former, current, or potential suppliers of lethal injection drugs to the federal government is reasonably likely to endanger law enforcement proceedings related to the government's efforts to effectuate capital sentences.

Even if BOP is able to procure a quantity of compounded pentobarbital prior to disclosure, disclosure will interfere with current and anticipated enforcement proceedings.  Numerous lawsuits have been filed in the past by suppliers to enjoin executions by states that had obtained their lethal injection drugs from those businesses after the business's identity was disclosed.  *See* Christenson Decl. ¶ 119 & n. 18; *see also In re Lombardi*, 741 F.3d 888, 894 (8th Cir. 2014) (noting that after the 2013 disclosure of the identity of the pharmacy that supplied Texas with its lethal injection drug, the pharmacy "demanded the . . . return [of] a supply of compounded pentobarbital sold for use in executions, because of a 'firestorm,' . . . that resulted from publication of the pharmacy's identity") (quoting from the record).

BOP is well aware of the sensitivities at play here.  *See* Winter Decl. ¶¶ 16-17.  And its efforts to obtain lethal injection drugs for purposes of carrying out federal capital sentences have been limited as a result.  As a practical matter, few companies are even willing to manufacture, produce, distribute, or otherwise engage in conversation for the purchase of lethal injection substances.  *Id*. ¶ 18.  With respect to those that are willing, BOP has had extensive discussions with them regarding the need for privacy as companies have expressed extreme concern about the need to maintain confidentiality over their potential participation in the federal use of lethal injection drugs.  *Id*. ¶ 20.  In fact, BOP has provided potential and/or actual manufacturers,

23

distributors, and/or suppliers of lethal injection substances express assurances that, to the extent possible, their identities, contact information, and the fact or substance of any communication with BOP, would remain confidential. *Id.* ¶ 21. These companies have informed BOP that they would cease to manufacture, produce, distribute, or sell such substances for use in lethal injection procedures if their information was revealed. *Id.* ¶ 18.

Consequently, BOP took great care in applying Exemption 7(A) to all information that could lead to the disclosure of the identity of suppliers or potential suppliers of lethal injection drugs considered by BOP in the relevant time period. *See* Christenson Decl. ¶¶ 114-123.   For various records, information in those records that BOP withheld under Exemption 7(A) may also be exempt under one or more of the following:  Exemptions 4, 5, 6, 7(C), 7(E), and 7(F).  While every effort was made to release all segregable information, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information. *See* Christenson Decl. ¶ 124 & Ex. F.  *EPIC v. DOJ*, 82 F. Supp. 3d 307, 322 (D.D.C. 2015) (deeming sufficient agency's detailed declaration supporting its determination under Exemption 7(A)).  BOP's determination is entitled to a "presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  In sum, Defendants are entitled to summary judgment on their application of Exemption 7(A).

### 3.    Exemption 7(C) – and Exemption 6

FOIA Exemption (7)(C) protects "records or information compiled for law enforcement purposes [when disclosure] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  In applying the exemption, agencies are

24

required to balance the privacy interests of individuals against the public interest in disclosure.
*See DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989) (Exemption
(b)(7)(C)); *Davis v. DOJ*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).  Likewise, Exemption 6
protects from disclosure "personnel and medical files and similar files" when the disclosure of
such information would constitute a clearly unwarranted invasion of personal privacy.  5 U.S.C.
§ 552(b)(6).  "Similar files" is interpreted broadly and includes "[g]overnment records on an
individual which can be identified as applying to that individual," *U.S. Dep't of State v. Wash.
Post Co.*, 456 U.S. 595, 602 (1982).  Exemption 6 can be applied to "bits of personal
information, such as names and addresses, the release of which would create[ ] a palpable threat
to privacy." *Walston v. U.S. Dep't of Def.*, 238 F. Supp. 3d 57, 66 (D.D.C. 2017) (citing *Judicial
Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006)).

    While Exemption 6 requires a "clearly unwarranted" invasion to justify nondisclosure,
Exemption 7(C) is more protective of privacy than Exemption 6 and, thus, establishes a lower
bar for withholding material.  *Am. Civil Liberties Union v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).
Accordingly, the analysis under Exemption (7)(C) tilts more in favor of nondisclosure than it
would under Exemption 6.  *See Reporters Comm.*, 489 U.S. at 756.  Because the analyses under
both Exemptions are similar, case law pertaining to one exemption is often germane in
considering the other.  *See, e.g.*, *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

    In this case, the information that BOP withheld easily meets the requirements of both
Exemption 6 and Exemption 7(C) and were thus appropriately withheld from disclosure.
Throughout all of the records responsive to Mr. McDaniel's FOIA request, BOP applied
Exemptions 6 and 7(C) to the following types of information—names, initials, signatures, email

addresses, telephone/fax numbers, job titles, and department titles—any of which could be used to identify BOP or DOJ staff involved in some aspect of the execution protocol, third-party individuals who participated in the sale or potential sale of lethal injection substances to the federal government, or who have not consented to the release of their personal information.[7]

Due to the nature of their work in a sensitive occupation, as well as the nature of the records at issue here, the BOP or DOJ employees and third-party individuals whose identifying information was withheld have substantial privacy interests in such information.  For example, in April 2019, five individuals were sentenced for their role in murdering a BOP correctional officer.  Christenson Decl. ¶ 105 & Ex. L.  The individuals admitted that they conspired to murder the staff member specifically in retaliation for his actions in seizing contraband from them, and that they recruited the assistance of hitmen from outside the facility to do the job.  *Id*. In another case, an inmate in Pennsylvania stabbed a correctional officer at USP Canaan 200 times with two shanks and mutilated his body because of the inmate felt disrespected.  *Id*. ¶ 105 & Exs. M, N.  While such incidents are thankfully rare, these cases highlights the many risks of harm BOP staff members face as a result of carrying out their official duties.  *Id*.  This is particularly true in the lethal injection context.  *See* Winter Decl. ¶ 23 ("I have personally supervised and/or worked collaboratively with many of these individuals and am aware of the concerns they have about their personal safety, and that of their families and friends.").  *See also*

---

[7] *See* Christenson Decl. ¶ 102 & Ex. F, *Vaughn* Index for a more detailed description of information that was withheld in each record.

Christenson Decl. ¶¶ 62-65, 106 (describing risks of threats/harassment faced by suppliers of lethal injection substances).

That is the reason this Court entered a Protective Order in *Roane* (which still governs the Master Consolidated Case) expressly protecting the disclosure of the identities of the staff involved in past or future executions and prohibiting individuals from conducting investigations into their backgrounds and qualifications.  *See Roane*, 05-02337 (D.D.C.), Doc. 30-1 (Privacy Act Protective Order, protecting the identity of persons involved in executions); *see also* Winter Decl. ¶¶ 10-13, 24.

Courts have overwhelmingly found where information pertaining to the identity of law enforcement officers, and particularly those who may be subject to harassment or threats, is at issue, Exemptions 6 and 7(C) can be used to justify the withholding of such information.  *See e.g., Lesar v. DOJ*, 636 F.2d 472, 487 (D.C. Cir. 1980) (finding legitimate interest in concealing identities of government employees where disclosure "could subject them to annoyance or harassment in either their official or private lives"); *Walston*, 238 F. Supp. 3d at 67 (holding that Department of Defense investigators are "employed in a 'sensitive agenc[y]' and have 'sensitive occupations,'" and thus, "have a cognizable privacy interest in keeping their names from being disclosed."); *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 405 F. Supp. 3d 127, 144 (D.D.C. 2019) ("civilian federal employees have a right to control information related to themselves and to avoid disclosures that 'could conceivably subject them to annoyance or harassment in either their official or private lives'") (quoting *EPIC v. DHS*, 384 F. Supp. 2d 100, 116 (D.D.C. 2005)).

Similarly, courts have found third parties whose names and identifying information appear in law enforcement records have a substantial privacy interest in that information. *See e.g., SafeCard Servs.*, 926 F.2d at 1206 (holding names and addresses of private individuals appearing in law enforcement files to be categorically exempt from disclosure unless there exists compelling information that the agency is engaged in illegal activity and the information is necessary in order to confirm or refute that fact).

Where, as here, substantial privacy concerns are present, the requestor bears the burden of establishing a legitimate public interest which would outweigh such interests. *Ctr. for Biological Diversity*, 405 F. Supp. 3d at 145. Here, Plaintiff asserts that the FOIA request is "being submitted in the public interest and is likely to contribute significantly to public understanding of the operation or activities of [DOJ]." Christenson Decl. ¶ 107 & Ex. B. However, disclosure of the identifying, contact, and other personal information of BOP or DOJ staff or third parties does not shed light on BOP or DOJ's performance of its statutory duties, nor does it inform citizens as to what their government is up.

Especially given the potential for release of this information to result in harassment or threats to the individuals identified in the records, the public interest in understanding the operation or activities of DOJ is insufficient to outweigh their significant privacy interests. *Ctr. for Biological Diversity*, 405 F. Supp. 3d at 145 (finding that lower-level employees' interest in avoiding harassment outweighs the interest of public disclosure). As such, the names and direct contact information for BOP and DOJ employees involved in some aspect of the execution protocol and third-party individuals who participated in the sale or potential sale of lethal

injection substances to the federal government, were properly withheld pursuant to both Exemptions 6 and 7(C).

For various records, information in those records that BOP withheld under Exemption 6 and 7(C) may also be exempt under one or more of the following:  Exemptions 4, 5, 7(A), 7(E) and 7(F).  While every effort was made to release all segregable information, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.  *See* Christenson Decl. ¶ 109 & Ex. F.  Therefore, Defendants are entitled to summary judgment with respect to their assertion of Exemptions 7(C) and 6.

### 4.       Exemption 7(E)

To withhold information pursuant to Exemption (7)(E), an agency must demonstrate that release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions," or would "disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Courts within the D.C. Circuit and elsewhere are divided as to whether the phrase "if such disclosure could reasonably be expected to risk circumvention of the law" applies only to "guidelines," or also applies to "techniques and procedures."  *See PEER*, 740 F.3d at 204 & n.4 (discussing, but issuing no holding on the issue).  But the Court need not resolve that nuance here, because even if an additional showing that "disclosure could reasonably be expected to risk circumvention of the law" were required to protect these "techniques and

procedures" from disclosure, the "risk circumvention of the law" requirement presents a "low bar" that would be satisfied here.  *See id*. at 204-05 & n.4.

"'Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of [the requested] information might create a risk of circumvention of the law.'" *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)).  Therefore, Exemption 7(E) "exempts from disclosure information that could *increase the risks* that a law will be violated or that past violators will escape legal consequences."  *Mayer Brown*, 562 F.3d at 1193.  Exemption 7(E) also permits an agency to withhold information regarding non-public details about commonly-known procedures if the disclosure of such details could reduce or nullify their effectiveness.  *See, e.g.*, *Barnard v. DHS*, 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (recognizing that "[t]here is no principle . . . that requires an agency to release all details concerning these and similar techniques simply because some aspects of them are known to the public").

BOP has applied Exemption 7(E) here to withhold information describing the guidelines, techniques and procedures used to obtain lethal injection substances in Record Nos. 1-128, 130-37, 152, and 155-59.[8]  Christenson Decl. ¶ 130.  The disclosure of this information greatly increases the risk that BOP will be unable to procure the necessary substances for use in the lethal injection protocol, which in turn would greatly interfere with BOP's legal mandate to carry out capital sentences.  *Id*.  *See PEER*, 740 F.3d at 205 (upholding the invocation of Exemption

---

[8] *See* Christenson Decl., Ex. F, *Vaughn* Index, for a full description of the records and withheld information under Exemption 7(E).

7(E) as to emergency action plans for two dams in the event of dam failure out of concern for sabotage or terroristic efforts to thwart the plans).  Although the public may be aware that the government must purchase lethal injection substances from outside sources, the process is not subject to full and open competition, as the disclosure of the agency's needs would compromise its ability to obtain such substances and would subject the parties involved to threats, harassment, or even physical injury.  Christenson Decl. ¶ 129.  As such, the specific techniques and procedures used to obtain lethal injection substances are not well known to the public, and in fact, are only shared with particularly identified BOP and DOJ personnel, and even those individuals are prohibited from sharing this information, even within their own agencies.  *Id.  See also* Winter Decl. ¶ 26.

Accordingly, the law enforcement techniques and procedures utilized by BOP are subject to withholding under Exemption 7(E) and Defendants are entitled to summary judgment regarding their application of Exemption 7(E).

For various records, information in those records that BOP withheld under Exemption 7(E) may also be exempt under one or more of the following:  Exemptions 4, 5, 6, 7(A), 7(C) and 7(F).  While every effort was made to release all segregable information BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.  Christenson Decl. ¶ 131 & Ex. F.

### 5.    Exemption 7(F)

Exemption (7)(F) protects "records or information compiled for law enforcement purposes [that] . . . could reasonably be expected to endanger the life or physical safety of any

individual."  5 U.S.C. § 552(b)(7)(F).  In evaluating the validity of an agency's invocation of

Exemption 7(F), the court should, within limits, defer to the agency's assessment of danger.

*Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, CIV.A.

04-00377, 2006 WL 1826185 (D.D.C. June 30, 2006).  In contrast to Exemption (7)(C), agencies

are not required to balance privacy and public interests in applying this exemption.  *See*

*Raulerson v. Ashcroft*, 271 F. Supp. 2d 17, 29 (D.D.C. 2002).

      Here, as previously explained, disclosure of the names, personal identifiers and direct

contact information of BOP or DOJ staff or third parties associated with implementing the death

penalty could reasonably be expected to endanger their lives or physical safety.  Christenson

Decl. ¶¶ 104-105; Winter Decl. ¶¶ 22-25 & n.5.  *Boehm v. FBI*, 948 F. Supp. 2d 9, 36 (D.D.C.

2013) (holding that Exemption 7(F) justifies withholding names and identifying information of

federal employees).  For example, Mr. McDaniel himself has previously written of one such

threat sent by a commenter on the website of a pharmacy that was suspected of providing lethal

injection substances to the state of Missouri for executions.  *See* Christenson Decl. ¶ 134, Ex. S

(August 29, 2016 BUZZFEED, Inc. Article).[9]  The threat read as follows:

> Your site says nothing about pentobarbital.  Do you compound it for the state of
> Missouri's department of corrections, as has been publicly alleged in an AP story
> that ran this morning . . .?  . . . [W]ere I you I'd at least want to beef up my
> security now that you've been put in the spotlight as a likely supplier and failed to
> issue a flat denial.  As the folks at the federal building can tell you, it only takes
> one fanatic with a truckload of fertilizer to make a real dent in business as usual.
> In your place, I'd either swear to the nation that my company didn't make

---

[9] Chris McDaniel, FBI Documents Don't Back Up Claimed Threat to Execution Drug Supplier,
BUZZFEED.NEWS (August 29, 2016, 10:04 p.m.), https://www.buzzfeednews.com/article/
chrismcdaniel/fbi-documents-dont-back-up-claimed-threat-to-execution-drug.

> execution drugs of ANY sort, and then make dang sure that's true, or else openly
> accept the burden of putting my employees and myself at unacceptable (and
> possibly uninsurable) risk.  Just sayin'.

*Id*.  *See also Texas Dep't of Criminal Justice v. Levin*, 572 S.W.3d at 685 (identifying this exact

threat as sufficient evidence of a substantial threat of physical harm).

Because disclosure of individuals' names, identifying information, and direct contact

information could reasonably be expected to result in harassment, threats or other harms to their

lives and safety, this information is exempt pursuant to Exemption 7(F), and summary judgment

should be afforded to Defendants regarding their application of Exemption 7(F).

For various records, information in those records that BOP withheld under Exemption 7(F)

may also be exempt under one or more of the following:  Exemptions 4, 5, 6, 7(A), 7(C) and 7(E).

While every effort was made to release all segregable information BOP withheld the entirety of

those records in which exempt information was inextricably intertwined with non-exempt

information.  Christenson Decl. ¶ 136 & Ex. F.

## B.      FOIA EXEMPTION 4

Exemption 4 protects "[t]rade secrets and commercial or financial information obtained

from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  The exemption protects

the interests of both the government and the submitter of the information.  *See, e.g., Nat'l Parks &*

*Conservation Ass'n v. Morton*, 498 F.2d 765, 767-70 (D.C. Cir. 1974), *abrogated on other grounds*

*by Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019)  (concluding that the

legislative history of the FOIA "firmly supports an inference that [Exemption 4] is intended for

the benefit of persons who supply information as well as the agencies which gather it").

Specifically, it encourages submitters to provide the government with confidential information that

33

is accurate and reliable and provides assurances that such information will be safeguarded, thereby protecting submitters from competitive disadvantage if disclosed.  *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992).

When information does not contain trade secrets, Exemption 4 applies if the withheld information is shown to be "commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).

Information provided by a "person" includes "an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2); *see also Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996).  It also includes submitter-generated information summarized or reformulated by the agency.  *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 63 (D.D.C. 2015) (information is protected even if the government summarized information obtained from another person).  Similarly, this Court has held the fact that particular information is "arrived at through negotiation" with the government does not necessarily preclude it from being regarded as "obtained from a person."  *See Pub. Citizen Health Research Group v. NIH*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) (concluding that although a licensee's final royalty rate was the result of negotiation with the agency, that did "not alter the fact that the licensee is the ultimate source of [the] information," in as much as the licensee "must provide the information in the first instance").

The term "commercial or financial" "reaches . . . broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency."  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  "Commercial or financial" information is considered "confidential" under

34

Exemption 4 "whenever it is customarily kept private, or at least closely held, by the person imparting it." *Argus Leader*, 139 S. Ct. at 2363.  In *Argus Leader*, the Supreme Court noted that an additional requirement for confidentiality may be whether the party receiving the information has provided some assurance that it will remain secret.  *Id.*  The Court, however, declined to adopt such a requirement, as it found the condition to be clearly satisfied in the case before it. *Id.*  Nevertheless, the Court did note that particularly "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366.

In this case, BOP applied Exemption 4 to the following records:

a. Record No. 155-156;
b. Record No. 157;
c. Record No. 158;
d. Record No. 159; and
e. Record Nos. 1 – 81 (email records).[10]

Each of these records contain confidential commercial or financial information provided to BOP by a "person," as required by Exemption 4.  For example, Exemption 4 was applied to all information that could lead to the identity of individuals and/or companies supplying or potentially supplying lethal injection substances to the federal government.  This information includes names (both personal and company names), account numbers, phone numbers, addresses, DEA & Tax ID numbers, dates of potential or actual sales of lethal injection

---

[10] *See* Christenson Decl. ¶ 52, Ex. F, *Vaughn* Index, for a full description of the records and withheld information.  These records include duplicative records, which were deemed subject to the same exemptions as the original record.

substance(s), and substance descriptions, including item/stock/UPC numbers, price, quantity, and packaging details, all of which could be used to identify the suppliers and/or potential suppliers of lethal injection substances.  *See* Christenson Decl. ¶¶ 58-59 & Ex. F.

BOP also applied Exemption 4 to expiration dates for substance(s) manufactured and/or held for sale, pricing strategies, unique business models, and purchasing requirements utilized by the commercial entity supplying the information.  The information was provided either directly from a source provider, was encompassed into the negotiation with the source provider for a transaction, or was forwarded or incorporated into email communications between BOP staff.  *Id*.

This material is of the type that courts have routinely found to be commercial in nature for purposes of Exemption 4.  *See e.g., Elec. Privacy Info. Ctr.*, 117 F. Supp. 3d at 62 (finding the name and identity of a company to be "commercial" for Exemption 4 purposes when disclosure could have a commercial or financial impact on the company involved); *Gellman v. Dep't of Homeland Sec.*, No. 16-CV-635 (CRC), 2020 WL 1323896, at *10 (D.D.C. Mar. 20, 2020) (access to how a vendor formats, designs, and organizes its product could implicate the "commercial interest" in the vendor's ability to maintain its government contract).

The withheld information is also confidential as defined by the Supreme Court in *Argus Leader*.  As discussed exhaustively above, disclosure of this information, and any other commercial information that could be used to identify the suppliers, could subject such individuals and/or companies to harm to their competitive business interests.  *See, e.g., Texas Dep't of Criminal Justice*, 572 S.W.3d at 682 (recognizing that a fear of negative publicity and declining sales was one of the reasons pharmacies do not want to be publicly identified as supplied lethal

injection drugs).  *See supra* Part IV.A.2.  Due to these fears, during the times relevant to the Complaint, BOP restricted communications with, and knowledge of, providers of lethal injection substances only to those within BOP who were directly involved in the process of obtaining the substances or had a need to know the information in the performance of their duties.  Christenson Decl. ¶ 66.  Similarly, providers keep their identity as a supplier of lethal injection substances, or even the mere fact that it has engaged in communications with states or the federal government for the purpose of discussing the sale/purchase of such substances, private.  Winter Decl. ¶¶ 19.  Further, BOP has provided suppliers/potential suppliers of lethal injection substances express assurances that, to the extent possible, their identities and contact information will remain confidential.  *Id.* ¶ 21

Because the withheld information is customarily and actually kept private by the person or persons who provided it, and was provided under some assurance that the information would remain private, the information is "confidential" for purposes of Exemption 4.  *Argus Leader*, 139 S. Ct. at 2363.  Because revealing the withheld commercial information provided by suppliers or potential suppliers of lethal injection substances is likely to impair the government's ability to obtain necessary information for the procurement of lethal injection substances in the future, it is "confidential" and exempt from release pursuant to Exemption 4.

For various records, information in those records that BOP withheld under Exemption 4 may also be exempt under one or more of the following:  Exemptions 5, 6, 7(A), 7(C), 7(E) and 7(F).  While every effort was made to release all segregable information, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt

information.  Christenson Decl. ¶ 69 & Ex. F.  As such, summary judgment should be afforded

Defendants regarding their application of Exemption 4.

C.      **FOIA Exemption 5**

Exemption 5 of the FOIA protects from disclosure "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party . . . in litigation with the

agency."  5 U.S.C. § 552(b)(5).  Documents that would ordinarily be privileged in a civil discovery

context are protected from public disclosure.  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132,

148-149 (1975); *Martin v. Office of Special Counsel, Merit Sys. Protection Bd.*, 819 F.2d 1181,

1184-87 (D.C. Cir. 1987).  Exemption 5 encompasses three different privileges:  the attorney-client

privilege, the attorney work-product doctrine, and the deliberative process privilege.   *Sears,

Roebuck & Co.*, 421 U.S. at 149; *see also Gellman*, 2020 WL 1323896, at *11.

1.      **Deliberative Process, Attorney-Work Product and Attorney-Client
        Privileges**

*(a)      Deliberative Process Privilege*

"The deliberative process privilege, also known as the 'executive' or 'governmental'

privilege serves many purposes."  *Eugene Burger Mgmt. Corp. v. U.S. Dep't of Housing and

Urban Dev.*, 192 F.R.D. 1, 4 (D.D.C. 1999).  In particular, it serves to assure that subordinates

within an agency will feel free to provide the decision maker with their uninhibited opinions and

recommendations without fear of being subject to public ridicule or criticism; to protect against

premature disclosure of proposed policies before they have been finally formulated or adopted;

and to protect against confusing the issues and misleading the public by dissemination of

documents suggesting reasons and rationales for a course of action which were not in fact the

ultimate reasons for the agency's actions.  *Id.* at 4 (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  The main purpose of this privilege is to "prevent injury to the quality of agency decisions."  *Sears Roebuck & Co.*, 421 U.S. at 151.  The privilege does so by shielding the opinions, conclusions, and reasoning used in the administrative and decision-making process.  *See Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992); *Access Reports v. DOJ*, 926 F.2d 1192, 1194-95 (D.C. Cir. 1991).

The privilege remains even after a final decision has been made, because "disclosure at any time could inhibit the free flow of advice."  *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 360 (1979).  The privilege covers communications which are themselves deliberative in nature, as well as communications which, if revealed, would expose to public view the deliberative process of an agency.  *Heggestad v. DOJ*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000).

For a document to be covered by the deliberative process privilege, it must be both "predecisional," i.e., generated prior to the adoption of an agency policy, and "deliberative," i.e., reflecting the give-and-take of the consultative process. *Coastal States*, 617 F.2d at 866.  In determining whether a document is predecisional, an agency need not identify a specific decision in connection with which a document is prepared. *Sears, Roebuck & Co.*, 421 U.S. at 151 n.18. Because agency deliberations do not always ripen into agency decisions, the privilege is meant to protect the decisional *process*.  *Id.*; *see also Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987).  To show that a document is predecisional, the agency need only establish "what deliberative process is involved, and the role played by the documents at issue in . . . that process."  *Heggestad*, 182 F. Supp. 2d at 7 (citing *Coastal States*, 617 F.2d at 868).

39

Documents are deliberative in nature if they are "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). Thus, the exemption covers recommendations, draft documents, proposals, analyses, suggestions, discussions, and other subjective documents that reflect the give-and-take of the consultative process. *Coastal States*, 617 F.2d at 866.

(b)     *The Attorney Work-Product Doctrine*

The attorney work-product doctrine protects against the disclosure of material "prepared in anticipation of litigation or for trial or for another party or by or for that other party's representative." *McKinley v. Bd. Of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 341 (D.C. Cir. 2011); *Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005). Protected work product is not limited to "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *FTC v. Grolier*, 462 U.S. 19, 25 (1983). Rather, "factual material is itself privileged when it appears within documents that are attorney work-product," and if a record may be withheld under the attorney work-product protection of Exemption 5, "then segregability is not required." *Judicial Watch*, 432 F.3d at 371.

(c)     *The Attorney-Client Privilege*

The attorney-client privilege protects confidential communications between an attorney and her client relating to a legal matter for which the client has sought legal advice or services. *Mead Data Cent. Inc. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977). In the FOIA context, the agency is the "client" and the agency's lawyers are the "attorneys" for the purposes of attorney-client privilege. *Coastal States*, 617 F.2d at 863. The privilege applies to facts supplied

40

by a client to his attorney, opinions by an attorney based upon and reflecting those facts, and communications between attorneys reflecting the client-supplied information. *See id.* at 862; *see also Elec. Privacy Info. Ctr. v. DHS*, 384 F. Supp. 2d 100, 114 (D.D.C. 2005); *Schlefer v. United States*, 702 F.2d 233, 244 n.26 (D.C. Cir. 1983). Unlike the work-product doctrine, the attorney-client privilege is not limited to the context of litigation. *Mead Data*, 566 F.2d at 252-253; *Elec. Privacy Info. Ctr.*, 384 F. Supp. 2d at 114.

### 2.      BOP's Application of Exemption 5 and the Privileges

In this case, BOP applied Exemption 5 to records, as individually described in the declaration of Ms. Christenson and the *Vaughn* Index, as follows:

- *Communications regarding identifying viable substances for inclusion in the execution protocol*

BOP withheld, pursuant to Exemption 5 and the deliberative process privilege ("DPP"), email Record Nos. 1, 19, 33, 45, 57, 58, 78, 135-137, and 152,[11] and any duplicate records thereof. These records were generated prior to the finalization of the execution protocol addendum and reflect discussions among and between staff that would reveal BOP's deliberative process in identifying, obtaining, and selecting an appropriate substance to be included in the revised execution protocol. Christenson Decl. ¶¶ 92. As such, the records are both predecisional and deliberative, and thus protected by the DPP.

---

[11] Record Nos. 136 and 152 are also covered by the attorney-client and work-product privileges because the records contain legal analysis, advice, and opinions regarding specific lethal injection substances and equipment that were being considered for inclusion in the federal execution protocol, and methods to procure such substances and equipment. The email communications were generated as part of BOP's efforts to revise the execution protocol and in anticipation of the pending protocol litigation. *See* Christenson Decl. ¶ 93.

- *Communications regarding execution protocols utilized by different states*

BOP withheld, pursuant to Exemption 5 and the DPP, email Record Nos. 82-120 and 130-34, including any duplicates thereof. These records were generated prior to the finalization of the execution protocol addendum, and contain discussions among and between BOP staff regarding other execution protocols utilized by state agencies. They include individual staff's recommendations, comments, or opinions regarding the practical implications of utilizing or adopting those protocols, in whole or in part, for the federal execution protocol. Disclosure of the records would expose BOP's deliberative process in formulating the revised execution protocol, and as such, are protected by the DPP. Christenson Decl. ¶ 94.

Of the email records listed above, the following are also subject to the attorney-client and work-product privileges: Record Nos. 82-91, 93, 95-99, 101-103, 105-120, 130-134, and any duplicates thereof. Because the death penalty and the lethal injection protocol are inherently legal processes, advice and guidance from agency attorneys was instrumental in creating BOP's execution protocol addendum. Also, given the backdrop of ongoing litigation concerning the execution protocol at the time in *Roane*, *Robinson*, *Bourgeois*, and *Fulks*, legal analysis concerning the possible implementation of state protocols, in whole or in part in the federal execution protocol, was necessarily sought by BOP. The work-product doctrine applies too, as the emails were generated in anticipation of the pending protocol litigation. Thus, both the attorney-client privilege and work-product doctrine apply to these records. Christenson Decl. ¶ 95.

- *Communications regarding expert testimony*

BOP applied the deliberative process, attorney-client and work-product privileges to email Record Nos. 121-128, including duplicates thereof, consisting of communication between BOP

attorneys and between BOP and DOJ attorneys discussing the litigation advantages and disadvantages of selecting various individuals for purposes of providing expert testimony or consultation regarding revisions to the execution protocol. *See* Christensen Decl. ¶¶ 96-97. These records were generated prior to the finalization of the execution protocol addendum, and contain opinions and deliberations by agency attorneys related to BOP's efforts to revise the execution protocol. Disclosing such documents would reveal a key aspect of the agency's deliberative process in revising the execution protocol. Further, the records contain legal advice concerning confidential information that has not been released (i.e., identity of potential expert and content of information sought to be obtained from the expert), as well as legal analysis, opinions, and work-product prepared in both anticipation of revising the federal execution protocol and the pending litigation challenging the protocol. As such, the documents are protected by all three privileges discussed.[12]

- *Communication regarding joint status report*

BOP withheld Record No. 129 pursuant to Exemption 5 and the deliberative process, attorney-client and work-product privileges. This record consists of email communication

---

[12] While Record Nos. 126 and 127 consist of a declaration and its cover page, they were provided as an attachment to privileged email discussions. The attorney-client privilege and work-product privileges apply to factual materials if they were provided to an attorney for the purpose of obtaining legal advice, or were included among mental opinions and impressions prepared in anticipation of litigation. *See Coastal States*, 617 F.2d 854 at 862 (indicating the purpose of the attorney-client privilege is to protect a client's disclosures to an attorney); *Judicial Watch*, 432 F.3d at 371 (indicating the work-product doctrine does not distinguish between factual and deliberative material). Here, the declaration was provided to the attorneys in order to solicit legal advice concerning its contents, and the emails records contain discussions and opinions concerning its content. Disclosure would reveal litigation strategy being considered in *Roane*, *Robinson*, *Bourgeois*, and *Fulks*, and was subject to consideration, analysis, and comment by BOP and DOJ attorneys during deliberations over revisions to the execution protocol.

between BOP and DOJ attorneys discussing the contents of a status report to be filed in the pending protocol litigation, *Roane*, 05-02237 (D.D.C.).  Christenson Decl. ¶ 98.  The record contains legal advice concerning confidential information that has not been released, as well as legal analysis, opinions, and suggested litigation strategy. The records were created prior to the adoption of the execution protocol addendum and reflect BOP's deliberative process in creating the revised federal execution protocol.  As such, the record is subject to each of the three litigation privileges asserted by BOP.

- *Communications regarding media inquiries*

BOP withheld Record Nos. 138-151 pursuant to Exemption 5 and the DPP. These records consist of email communications in which BOP and DOJ attorneys and staff discussed proposed answers to media inquiries regarding the death penalty and BOP's execution protocol.  The records are subject to the DPP because they were predecisional (discussions occurred prior to finalization of revised protocol) and were deliberative (contain discussions and recommendations concerning BOP's existing policies).  Christenson Decl. ¶ 99.  Additionally, this Court has found that records are protected by the DPP when they contain "discussions of how to respond to press inquiries," because to hold otherwise would defeat the purpose of the privilege by reducing the ability of government officials to be candid when deliberating about how to respond to the press.  *Gellman*, 2020 WL 1323896 at *12.

Among those records, Record Nos. 139-151 are also protected by the attorney-client privilege because they were prepared in response to DOJ's request for legal advice pertaining to BOP's execution protocol and the ongoing litigation in *Roane*, *Robinson*, *Bourgeios* and *Fulks*. For similar reasons, the work-product doctrine applies to these records.  Christenson Decl. ¶ 99.

44

For various records, information in those records that BOP withheld under Exemption 5 may also be exempt under one or more of the following:  Exemptions 4, 6, 7(A), 7(C), 7(E) and 7(F).  While every effort was made to release all segregable information, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.  *See* Christenson Decl. ¶ 100 & Ex. F. As such, summary judgment should be afforded Defendants regarding their application of Exemption 5.

## <u>CONCLUSION</u>

For the aforementioned reasons, Defendants respectfully request that this Court grant judgment as a matter of law in Defendants' favor.

June 12, 2020                                Respectfully submitted,


                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            ELIZABETH J. SHAPIRO
                                            Deputy Director, Federal Programs Branch

                                            <u>/s/ Jonathan D. Kossak</u>

                                            JONATHAN D. KOSSAK
                                            Trial Attorney (DC Bar # 991478)
                                            U.S. Dep't. of Justice, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, D.C. 20005
                                            Tel. (202) 305-0612; Fax. (202) 616-8460
                                            Email:  jonathan.kossak@usdoj.gov